IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


UNITED STATES OF AMERICA,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀No. 3:05-CR-36
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀⠀(VARLAN/GUYTON)
REGINALD L. HALL, ADVANCED⠀⠀)
INTEGRATED MANAGEMENT SERVICES,⠀)
INC. ("AIMSI"), and DAVID F. REEDER,⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀⠀)


## REPORT AND RECOMMENDATION

⠀⠀⠀⠀⠀⠀All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate.  This matter comes before the Court upon the defendants' Motion to

Dismiss Counts 1-15 of the Indictment for Failure to State an Offense – No "Scheme to Defraud"

the Government is Alleged [Doc. 26]; the defendants' Motion to Dismiss Counts 1 and 16-26 of the

Indictment Because the Money at Issue Was Not Money or Property of the United States [Doc. 28];

and the defendants' Motion to Dismiss the Money Laundering Charges in Indictment, Counts 1 and

27-39 [Doc. 30], which were filed on November 4, 2005.[1]  The parties came before the Court for a

hearing on these motions on January 5 and 20, 2006.  The government was represented by Assistant

United States Attorney Guy W. Blackwell; the defendant Reginald L. Hall was represented by

---

[1]These motions were originally filed by the defendant Reginald L. Hall and were
subsequently adopted by the other defendants. [Doc. 66].

attorneys W. Thomas Dillard and Wade V. Davies; the defendant Advanced Integrated Management

Services, Inc. ("AIMSI") was represented by attorney Nelson M. Jones, III; and the defendant David

F. Reeder was represented by attorney Douglas A. Trant. At the conclusion of the hearing, the Court

took the motions and related filings under advisement.

## I. <u>Motion to Dismiss Counts 1-15 of the Indictment</u>

The defendants move the Court to dismiss counts 1-15 of the indictment charging

violations of the mail fraud and wire fraud statutes and a conspiracy to commit violations thereof,

because these counts fail to state an offense. [Doc. 26]. Specifically, the defendants argue: (1) that

the allegations in the indictment are insufficient as a matter of law to constitute a "scheme to

defraud" as there are no allegations of a deprivation of money or property of the United States and

(2) that there are no factual allegations to show that the conduct alleged in the wire and mail fraud

counts furthered a scheme to defraud the United States. [Doc. 27].

The government opposes the defendants' motion, arguing that the indictment clearly

meets the requirements of Fed. R. Crim. P. Rule 7(c)(1). [Doc. 32].

The Notice Clause of the Sixth Amendment guarantees a defendant's right to be

informed of the government's charges against him. <u>See</u> <u>United States v. Superior Growers Supply,</u>

<u>Inc.</u>, 982 F.2d 173, 176 (6th Cir. 1992). Rule 7(c)(1) of the Federal Rules of Criminal Procedure

provides, in pertinent part, as follows:

> The indictment or information must be a plain, concise, and definite
> written statement of the essential facts constituting the offense
> charged and must be signed by an attorney for the government. It
> need not contain a formal introduction or conclusion. A count may
> incorporate by reference an allegation made in another count. A
> count may allege that the means by which the defendant committed

2

the offense are unknown or that the defendant committed it by one or more specified means. For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.

Fed. R. Crim. P. 7(c)(1).

The Sixth Circuit has held that an indictment must meet two requirements to be sufficient: "first, the indictment must set out all of the elements of the charged offense and must give notice to the defendant of the charges he faces; second, the indictment must be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts." United States v. Martinez, 981 F.2d 867, 872 (6th Cir. 1992) (citing Russell v. United States, 369 U.S. 749, 763-64 (1962)). Generally, an indictment is sufficient if it "set[s] forth the offense in the words of the statute itself, as long as 'those words . . . fully, directly, and expressly . . . set forth all the elements necessary to constitute the offense intended to be punished.'" United States v. DeAndino, 958 F.2d 146, 147 (6th Cir. 1992) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)). A general description of the offense, however, must "be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." Hamling, 418 U.S. at 117-18. An indictment is "presumed sufficient if it tracks the statutory language, cites the elements of the crimes charged, and provides approximate dates and times." United States v. Anderson, 1999 WL 503519, at *3 (6th Cir. July 9, 1999) (quoting United States v. Chichy, 1 F.3d 1501, 1504 n.3 (6th Cir. 1993)).

"The elements of a section 371 conspiracy to defraud are: (1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance

of the illegal purpose; and (3) the intent to commit the substantive offense, i.e., to defraud the United

States." United States v. Douglas, 398 F.3d 407, 413 (6th Cir.), reh'g en banc denied, May 3, 2005.

Count one of the indictment sets forth all of the elements of the offense of conspiracy. Specifically,

in the "Objects of the Conspiracy," count one alleges that the defendants "willfully and knowingly

did combine, conspire, confederate and agree with each other and divers other persons to the grand

jury known and unknown to commit" the offenses of mail fraud, wire fraud, theft of property of the

United States, and money laundering. [Doc. 1 at 4-5]. The Court finds that count one sets forth all

of the elements of the offense of conspiracy to defraud, gives notice to the defendants of the charges,

and is sufficient to protect the defendants from double jeopardy. See id. Accordingly, the Court

finds that count one sufficiently alleges a violation of 18 U.S.C. § 371.

To establish a violation of the mail fraud statute, 18 U.S.C. § 1341, the government

must establish two elements: "(1) a scheme to defraud, and (2) the mailing of a letter, etc., for the

purpose of executing the scheme." United States v. Azad, 809 F.2d 291, 295 (6th Cir. 1987)

(quoting United States v. Valavanis, 689 F.2d 626, 627 (6th Cir. 1982)). As the Sixth Circuit has

stated:

> It is not necessary that the scheme contemplate the use of the mails
> as an essential element. Nor is it required that the false
> representations themselves were transmitted by mail. It is sufficient
> that the use of the mails was caused by the defendant in furtherance
> of the fraudulent scheme. Where one does an act with knowledge
> that the use of the mails will follow in the ordinary course of
> business, or where such use can reasonably be foreseen, even though
> not actually intended, then he "causes" the mail to be used. That the
> confirmation letters and mailed check could have been hand-
> delivered or delivered otherwise than through the mails, is
> immaterial.

4

United States v. Campbell, 845 F.2d 1374, 1382 (6th Cir. 1988) (quoting United States v. Talbott,

590 F.2d 192, 195 (6th Cir. 1978) (citations and quotation marks omitted)).

The elements of the offense of wire fraud, 18 U.S.C. § 1343, include "(1) a scheme

or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and

(3) intent to deprive a victim of money or property." United States v. Daniel, 329 F.3d 480, 485 (6th

Cir. 2003) (quoting United States v. Prince, 214 F.3d 740, 747-48 (6th Cir. 2000)).

The indictment in the present case sets forth the required elements of both the mail

fraud statute and wire fraud statute. Count one of the indictment sets forth the manner and means

of the conspiracy, which provides specific details regarding the operation of the alleged fraudulent

scheme. The indictment specifically alleges as follows:

> 12. AIMSI was awarded multiple U.S. Department of Energy (DOE)
> contracts administered by DOE prime contractor U.T.-Batelle, LLC,
> and its predecessors. Additionally, AIMSI was awarded cost and
> fixed price contracts from the U.S. DOE, U.S. Army Corps of
> Engineers and other government agencies. At issue was the
> percentage that AIMSI billed for overhead and general and
> administrative (G&A) expenses. Overhead expenses included
> administrative salaries not billed to a specific contract, professional
> services, computer rental, repair and maintenance, office equipment,
> rent, travel, vehicle and marketing expenses. Overhead expenses
> were included in AIMSI billings to the United States.

[Doc. 1 at 4]. In short, the indictment alleges that the fraudulent scheme operated as follows:

Defendant Hall caused defendant Reeder and others to prepare fraudulent purchase orders and

invoices in company names for fictitious work and submit them to AIMSI for payment. Hall would

then approve the fraudulent purchase orders and invoices for payment by AIMSI check(s). Hall

would then direct AIMSI employees to submit the fraudulent purchase orders and invoices as

overhead expenses and general and administrative expenses (G&A) to be paid through U.T. Batelle,

LLC, from money and funds of the United States, in or to be deposited into the AIMSI account(s). Hall would direct defendant Reeder and others to deposit the AIMSI checks into Biosterile, SWS, Spectra Tech, and other bank accounts; to prepare checks from Biosterile, SWS, Spectra Tech and other bank accounts for payment of fictitious work from companies that defendant Hall controlled; and to retain a portion of the AIMSI check amount(s) as salary or payment for laundering the money and funds of the United States. [Id. at 6-7].

These allegations are realleged and reincorporated by reference in counts 2-5, the mail fraud counts, and counts 6-15, the wire fraud counts. Counts 2-5 set forth the date of the mailings at issue, the amounts of the checks in question, and their intended recipient and specifically alleges that defendant Hall, aided and abetted by AIMSI, defendant Reeder and others, caused to be delivered by mail certain checks "for the purpose of executing the aforesaid scheme and artifice to defraud . . . ." [Id. at 13, 14]. Counts 6-15 set forth the date of the wire communications (specifically, emails) at issue, the sender of those emails, as well as the recipient, and specifically alleges that defendant Hall, aided and abetted by defendant AIMSI and others, caused to be transmitted certain emails "for the purpose of executing and attempting to execute a scheme and artifice to defraud . . . ." [Id. at 15].

The Court finds that the indictment adequately sets forth specific details of the alleged fraudulent scheme. It further specifically identifies the victim of the alleged fraudulent scheme as the United States and the money illegally being obtained as the funds of the United States. [Id. at 6]. Finally, the Court finds that there are sufficient factual allegations to show that the conduct alleged in the wire and mail fraud counts further the fraudulent scheme. Accordingly, the

Court finds that counts 2-5 and counts 6-15 sufficiently allege violations of 18 U.S.C. §§ 1341 and 1343, respectively.

In summary, the Court finds that the indictment is sufficiently specific to inform the defendants of the charges against them, to protect them from double jeopardy, and to enable their preparation for trial.  See Azad, 809 F.2d at 296 (affirming denial of motion to dismiss). Accordingly, it is **RECOMMENDED** that the defendants' Motion to Dismiss Counts 1-15 of the Indictment for Failure to State an Offense – No "Scheme to Defraud"  the Government is Alleged [Doc. 26] be **DENIED**.

## II.  Motion to Dismiss Counts 1 and 16-26 of the Indictment

The defendants move for an Order dismissing count one and counts 16-26 of the indictment charging theft of property of the United States in violation of 18 U.S.C. § 641.  For grounds, the defendants argue that the indictment fails to sufficiently allege that the money at issue in count one and counts 16-26 was the property of the United States.  [Doc. 28].  In a post-hearing brief, the defendants argue that the government did not suffer any loss as a result of the alleged transactions.  [Doc. 72].

Counts one and 16-26 charge that the defendant Hall did "willfully steal, purloin and knowingly convert" to his own use "money of the United States by deposit of an AIMSI check" into a particular account listed in the indictment.  Each substantive count of theft describes a particular AIMSI check deposit into either an SWS or Biosterile account and adopts and incorporates the introduction, purpose, and manner and means of the conspiracy count.  The method of the alleged

7

theft is set forth in the "Manner and Means" section of count one, which can be summarized as

follows:

> (1) Defendant Hall would contact defendant Reeder and others and direct them to prepare fraudulent purchase orders and invoices in company names for fictitious work and submit them to AIMSI for payment;

> (2) Defendant Hall would approve the fraudulent purchase orders and invoices for payment by AIMSI checks;

> (3) Defendant Hall would direct AIMSI employees to submit the fraudulent purchase orders and invoices as overhead expenses and general and administrative expenses (G&A) to be paid through U.T. Batelle, LLC, from money and funds of the United States, in or to be deposited into the AIMSI account(s);

> (4) Defendant Hall would direct defendant Reeder and others to deposit the AIMSI checks into Biosterile, SWS, Spectra Tech, and other bank accounts;

> (5) Defendant Hall would direct defendant Reeder and others to prepare checks from Biosterile, SWS, Spectra Tech and other bank accounts for payment of fictitious work from companies defendant Hall controlled, including Pitstyle Kennels, Lynn and Associates ("Lynn"), Applied Integrated Contractors ("AIC"), Rela and others;

> (6) Defendant Hall would direct defendant Reeder and others to retain a portion of the AIMSI check amounts as salary or payment for laundering the money and funds of the United States;

> (7) Defendant Hall would cause the checks to be deposited into Pitstyle Kennels, Lynn, AIC, EAW and other accounts for his own personal use and benefit.

[Doc. 1 at 6-7]. The alleged acts of theft constitute the alleged "scheme to defraud" in the mail and

wire fraud counts (counts 2-15), and is the basis for the specified unlawful activities in the money

laundering charges (counts 27-39). [Doc. 1 at 13-15, 17-21].

8

The defendants argue that the indictment is fatally deficient in two respects. First, the defendants argue that the transactions alleged to constitute theft – that is, the deposit by third parties of certain checks written by AIMSI on its bank account – were transactions involving AIMSI's money, not money of the United States, and thus, the counts fail on the basic jurisdictional element that the theft be of "money . . . of the United States." [Doc. 28]. Second, the defendants argue that the checks in question were never billed as direct labor on any of the contracts, but rather were booked as indirect expenses and thus have not resulted in any increase or change in the rates billed by AIMSI to this day. Accordingly, the defendants contend that the government has not suffered any loss as a result of these transactions. [Doc. 72].

The government contends that the indictment sufficiently charges violations of 18 U.S.C. § 641. It argues that the money at issue in counts one and 16-26 was the property of the United States at the time of the alleged acts of theft, and that the United States suffered an actual loss as a result of the defendants' conduct. [Doc. 71].

In response to the defendants' motion to dismiss, the government filed an expert disclosure designating Alice C. Peterson, a Senior Staff Accountant with the United States Department of Energy ("DOE"), as an expert in U.S. government contracting. [Doc. 46]. The government contends that the Court should consider her testimony in deciding whether the money at issue was "money of the United States." [Doc. 56]. The defendants moved for a Daubert hearing with respect to any expert testimony offered by the government. [Doc. 53]. The defendant Hall also filed an expert disclosure designating Lewis H. Jones as an expert in AIMSI billing practices on December 30, 2005. [Doc. 55]. The government moved for a Daubert hearing with respect to any expert testimony offered by the defendants [Doc. 62], and defendant Hall subsequently withdrew

9

his expert designation [Doc. 63]. Thus, a hearing was held on January 5 and January 2, 2006, with Ms. Peterson testifying as the only witness on the <u>Daubert</u> and motion to dismiss issues.

The defendants have stipulated that Ms. Peterson is qualified to testify as an expert on government contracting procedures and the process by which certain claims are paid, and the Court has previously found that Ms. Peterson has stated a reliable basis for her opinions on these issues.

### A.     Peterson Testimony

U.T. Batelle, LLC ("UTB") is a prime contractor of DOE. UTB has a M&O (Management and Operating) contract with DOE to manage and operate the government facility located in Oak Ridge, Tennessee. [Testimony of Alice C. Peterson, Jan. 5, 2006, at 41, 46, 49]. As a DOE Senior Staff Accountant, Ms. Peterson monitors DOE prime contractors and their contracts, as well as their subcontractors and subcontracts. [<u>Id.</u> at 41]. M&O contractors, such as UTB, are paid by the U.S. Government and are ultimately responsible for providing oversight to subcontractors such as AIMSI. [<u>Id.</u> at 88-89].

The contract between DOE and UTB contains certain standard terms and conditions, which incorporate and reference various requirements of both the Federal Acquisition Regulations ("FAR") and the Department of Energy Acquisition Regulations ("DEAR"). [<u>Id.</u> at 49]. The FAR was enacted to provide uniform government agency procurement regulations. [<u>Id.</u> at 37]. Contracting officials use the FAR as a reference in determining whether costs are allowable or unallowable. [<u>Id.</u> at 38]. The FAR is incorporated into all government contracts and governs everything from the pre-award process all the way to the close-out process and contains rules that must be followed to conduct business with the government. [<u>Id.</u> at 40]. The FAR is supplemented

by the DEAR, which contains DOE-specific acquisition rules that may be more restrictive than the FAR. [Id.].

Pursuant to the standard terms and conditions set forth in its contract with the government, UTB is required to maintain certain accounts and records, and DOE is given the right to audit such accounts and inspect such records as necessary. [Ex. 6]. UTB is further required to conduct audits of subcontractors or arrange for such audits to be performed by the government. [Id.].

The standard terms and conditions also regulate UTB's award of contracts to subcontractors. For example, section I-126 requires UTB to obtain cost and pricing data in accordance with the FAR before awarding any subcontracts. [Id.]. UTB is required to determine the allowability of costs incurred by subcontractors in accordance with the FAR. UTB is further required to follow FAR 31 with respect to cost principles and FAR 52.230-2 with respect to cost accounting standards. [Ex. 6; Peterson Testimony at 50-55]. The standard terms and conditions also require UTB to "flow down" certain contract requirements to subcontractors. For example, UTB is required to incorporate the FAR's cost or pricing data requirements and cost accounting standards into its subcontracts. [Id.]

The subcontract between AIMSI and UTB also contains several standard terms and conditions. The subcontract states, in pertinent part, as follows:

> It is understood and agreed that [UTB] is authorized to and will make payment hereunder from Government funds advanced and agreed to be advanced to it by DOE and not from its own assets; and that administration of this subcontract may be transferred from [UTB] to DOE or its designee, and in case of such transfer and notice thereof to the Seller [UTB] shall have no further responsibilities hereunder.

11

[Ex. 19]. The subcontract further provides that the government shall have access to and the right to inspect and audit AIMSI's records and accounts, and requires AIMSI to maintain a system of accounting that is satisfactory to both UTB and the government. The subcontract also contains provisions regarding the invoicing of allowable costs and requiring the establishment of final indirect costs rates, consistent with the FAR. [Id.].

Before any contractor is awarded a contract or grant with the government, DOE requires that the contractor undergo an accounting system and financial capability review to ensure that the contractor has an acceptable accounting system, as well as the financial capability to carry out the work to be performed under the contract. [Peterson Testimony, Jan. 5, 2006, at 26]. Typically, the accounting system and financial capability review is performed either by DOE or by the Defense Contract Audit Agency ("DCAA"), which would then provide a report to DOE. [Id. at 27, 44]. The purpose of the review is to determine whether the contractor accounting system is adequate to segregate (1) costs between individual grants or jobs; (2) direct and indirect costs; and (3) unallowable costs. [Id. at 27].

Ms. Peterson was involved in the accounting system review of AIMSI in 2002, which was prepared at the request of the U.S. Army Corps of Engineers, which was in the process of proposing a contract to AIMSI. A report that was prepared for the U.S. Corps of Engineers to document this review states that the AIMSI accounting system is adequate and that the firm is financially capable of performing work under a government contract. [Id. at 28-30].

AIMSI used the Deltek accounting system, an accounting program used by many of the small businesses that have government contracts. [Id. at 43]. The Deltek system records costs in a manner that meets the requirements of the FAR with respect to segregating direct costs, indirect

costs, and unallowable costs. [Id.]. The Deltek system allows the contractor to identify which costs the contractor considers to be indirect (*i.e.*, general and administrative, overhead, or fringe), direct, and unallowable. The contractor also determines how many indirect pools to have, how they will distribute the indirect costs, and how they are going to charge direct versus indirect costs. [Peterson Testimony, Jan. 20, 2006, at 49].

Generally, there are three types of contracts that DOE's M&O contractors award to subcontractors: (1) cost contracts, where the government pays all of the contractor's costs that are allowable, allocable, and reasonable; (2) fixed-price contracts, where the government pays the contractor a lump sum to perform a service; and (3) time and material contracts, where the government pays a fixed amount for the contractor's time but reimburses contractors at cost for materials. [Peterson Testimony, Jan. 5, 2006, at 47]. AIMSI predominantly had cost-type contracts initially, and was awarded time and materials contracts when the government began awarding more of these. [Id. at 48].

With a cost contract, the contractor can recover direct costs, which are actual costs that can be attributed directly to a project (*i.e.*, labor). Additionally, contractors can recover a portion of their allocable indirect costs, including such costs as corporate officers' salaries, rent, and utilities. [Id. at 59-60]. The FAR requires that actual services have been performed before a subcontractor may bill direct costs. In other words, a contractor has to incur the costs before it becomes a cost to the government. [Id. at 82].

As for indirect costs, the contractor receives a provisional billing rate, which is based on a contractor's projected estimate of indirect costs for the fiscal year and allows the contractor to

13

apportion its indirect costs during the year. [Id. at 60, 82]. The provisional billing rate is usually determined during the pre-award process. [Id. at 61].

The FAR requires that contractors such as AIMSI submit a public voucher for claims for expenditures and for reimbursement. When a contractor incurs a cost, a public voucher is submitted listing the actual direct costs incurred during the billing period (which, in AIMSI's case, was a two-week period), plus a portion of the indirect costs based on the provisional billing rate. [Id. at 65]. The information contained in AIMSI's public vouchers is generated by the Deltek accounting system. When the U.S. Government advances money to a subcontractor under the provisional billing rate, it is paying for a portion of the subcontractor's estimated indirect costs for the year, subject to final audit. [Id. at 66]. Some indirect costs may not actually be incurred at the time the subcontractor is recovering costs for the indirects until the contractor provides its final indirect submission. [Id. at 82].

FAR 31 requires that a claimed cost be allocable to the government contract, meaning that any cost, whether direct or indirect, must be associated with work performed under the contract. The cost also must be allowable according to cost principles, and the cost must be reasonable. [Id. at 75]. When AIMSI generates a public voucher and provides it to UTB, an officer of AIMSI must certify that the claimed costs contain only allowable costs. [Id. at 91, 93-94].

At the end of the fiscal year, the contractor's indirect costs are reviewed and a final settlement is made based on the actual amount of indirect costs incurred versus what should have been billed. [Id. at 61]. Thus, if a contractor's provisional billing rate resulted in more payments to the contractor than what the contractor actually expended, pursuant to FAR 42, the contractor is required to pay the overage back to the government. Conversely, if the provisional billing rate

14

resulted in payments totaling less than the contractor's actual indirect expenses, the contractor would be owed additional money.  [Id. at 91, 104].

Changes in a contractor's provisional rate may occur if the contractor requests an adjustment to the provisional rate.  The provisional rate, from a billing standpoint, stays the same until the actual amount of indirect costs are calculated at the end of the fiscal year or until there is a new decision on adjusting the billing rate.  [Id. at 63-64].

To pay its subcontractors, M&O contractors, such as UTB, establish a Letter of Credit ("LOC") with a bank, which is a special financial arrangement that allows the bank to draw down funds directly from the U.S. Treasury.  [Id. at 42].  UTB's LOC was established on March 25, 1999.  [Id. at 76; Ex. 8].  Under the LOC banking arrangement, as the M&O contractor pays vouchers, the bank draws funds directly from the Treasury to recover the M&O's costs.  [Id. at 42].

An example of a typical transaction is as follows.  AIMSI would submit a voucher or claim for expenditures to UTB, which then would go through its approval process for the claim.  Once UTB approved the voucher or claim, UTB would cut a check to AIMSI.  Once AIMSI deposited the check with its bank, the check would be presented to UTB's bank, which would draw funds directly from the U.S. Treasury pursuant to the LOC.  In the case of a wire transfer, UTB would notify its bank that a wire transfer needed to be made.  UTB's bank would then wire funds to AIMSI's bank and then settle with the U.S. Treasury that night for all of that day's transactions.  [Id. at 74].  Once the money is received from UTB, it would be booked against a revenue account in the Deltek accounting system.  [Id. at 83].

Based upon her examination of the records, regulations, and the indictment, coupled with her experience, Ms. Peterson is of the opinion that the checks included in the overt acts alleged in counts 16-26 of the indictment represented funds of the United States. [Id. at 115-16]. She further opined that the loss to the United States occurred at the time the checks for the fraudulent invoices were written and booked, because the expenses were unallowable and unallocable but were booked as indirect costs and were included in determining the indirect rate and the final settlement of indirect costs on the contract. [Id. at 67].

**B.     Money of the United States**

The defendants first argue that the indictment fails to sufficiently allege that the funds at issue are "money . . . of the United States" within the meaning of 18 U.S.C. § 641. Property that forms the basis of a charge of theft pursuant to § 641 must belong to the government at the time that the alleged theft occurred; this ownership element furnishes the basis for federal jurisdiction. See United States v. Klingler, 61 F.3d 1234, 1236 (6th Cir. 1995). The parties agree [Docs. 71, 72] that the issue presented is purely a matter of law relating directly to the court's jurisdiction over the matter, and that it is therefore proper for this Court to decide the issue on a motion to dismiss. See id. at 1237 ("Since the facts are undisputed, this case presents a pure question of law concerning the interpretation of 18 U.S.C. § 641 . . . .").

The Sixth Circuit has stated that there are four situations in which property falls within the purview of 18 U.S.C. § 641: (1) "cases where the stolen property clearly belongs to the government and federal jurisdiction is undisputed"; (2) "instances where the federal government or one of its agents acts as a custodian or bailee of property, so the transitory possession make the property 'of the United States'"; (3) "cases where property or funds that came from the federal

16

government are now in private hands, but the government has *retained* sufficient control so that they remain government property"; and (4) "cases where a government employee or agent has received property but failed to convey it to the United States, so that the question is whether it has *attained* the status of government property." Klingler, 61 F.3d at 1238.

In the present case, there is no dispute that the funds at issue originated as government funds. The parties dispute, however, whether the government had sufficient control over the funds so that they retained their federal character and thus constituted "money . . . of the United States."

Money constitutes property of the United States within the meaning of § 641 even after being deposited into a bank account of the recipient and commingled with non-federal funds "so long as the government 'exercises supervision and control over the funds and their ultimate use.'" United States v. Howard, 787 F. Supp. 769, 770 (S.D. Ohio 1992) (quoting Hayle v. United States, 815 F.2d 879, 882 (2d Cir. 1987)). "Where the government no longer has supervision or control over funds or the ultimate use of the funds, and no longer has any pecuniary interest in the funds, it would grossly distort the English language to call those funds 'money . . . of the United States.'" Howard, 787 F. Supp. at 771. In Howard, the defendant was charged under 18 U.S.C. § 641 for stealing Social Security funds out of a recipient's checking account. Id. at 770. The Southern District of Ohio held that the funds at issue did not constitute money of the United States, because the Social Security funds had been properly paid to the recipient; once received, the recipient could spend the funds in any way she chose; and once paid, the government retained no control or supervision over the funds. Id. at 771. In so holding, the Court distinguished a similar case involving Social Security funds, United States v. Walker, 563 F. Supp. 805 (S.D. Iowa 1983).

17

In Walker, the Social Security funds had erroneously been deposited into a deceased recipient's bank account. The Walker Court had reasoned that these funds were property of the United States because federal regulations provided that the Social Security Administration was entitled to recover overpayments of Social Security benefits to the recipient. The Howard Court distinguished Walker, noting that the parties in Howard agreed that the benefits had been properly deposited into the recipient's account. See Howard, 787 F. Supp. at 771.

In United States v. Foulks, 905 F.2d 928 (6th Cir. 1990), the defendant was the director of community services at a local branch of the Salvation Army, which operated an emergency food program funded wholly by the Federal Emergency Management Agency ("FEMA"). Id. at 929. FEMA limited the Salvation Army to spending the money only for procurement costs, required certain record keeping and accounting procedures, and retained a reversionary interest in the funds. Id. The defendant wrote checks to purchase food for the emergency food program and retained a portion for himself. Id.

On appeal, the defendant argued that the funds at issue had lost their federal character and thus he could not be convicted of violating 18 U.S.C. § 641. Id. The Sixth Circuit disagreed, stating as follows:

> The evidence clearly shows that the funds, though in the accounts of
> the Salvation Army, retained their federal character. The Federal
> Emergency Management Agency limited or controlled the use of
> these funds in that the Salvation Army was required to report back to
> the federal agency, and any unused funds or misused funds were to
> be returned to the federal agency. Where the government retains
> power over grant funds, those funds retain their federal character
> even though deposited into accounts of non-federal agencies.

Id. at 930. In finding that the government retained an interest in the funds at issue, the Court distinguished United States v. Gavin, 535 F. Supp. 1345 (W.D. Mich. 1982). In Gavin, the

18

defendant was an officer of a local development agency, which served as a conduit for the procurement of Small Business Administration loans for local businesses.  Id. at 1346.  The defendant in Gavin withdrew funds from the agency's bank account for his personal use.  Id.  The Court found that these funds did not constitute money of the United States for two reasons.  First, the Court found that the requirement set forth in 15 U.S.C. § 696(2) that SBA funds be used for their intended purpose, standing alone, was not sufficient to establish a federal interest for purposes of 18 U.S.C. § 641.  Id. at 1348.  Second, the Court found that the SBA statute did not "manifest extensive federal control," in that the borrower of SBA funds did not have to maintain certain financial records, submit reports, adopt government methods of management, or submit to oversight of the government.  Id. at 1348-49.  Accordingly, the Court concluded that the SBA statute at issue did not provide for continued federal ownership of the loaned funds.  Id. at 1349.

In United States v. McKay, 274 F.3d 755 (2d Cir. 2001), cert. denied, 535 U.S. 1028 (2002), the defendant was convicted of conspiring to steal funds from the HUD rent subsidy program known as Section 8.  The HUD funds had been distributed to a local housing authority, which would then issue checks to landlords paying rent for the beneficiaries of the program.  Id. at 756.  The defendant argued on appeal that the HUD funds lost their federal character once they were paid to the local housing authority.  Id. at 758.  The McKay Court disagreed, finding that the United States government retained and exercised "substantial control" over the disposition of the HUD funds, evidenced by (1) the fact that HUD placed restrictions on the housing authority in its role as administrator of the Section 8 program and (2) the fact that HUD's regulations placed restrictions on landlords who received Section 8 funds.  Id. at 758-59.

In <u>United States v. Johnson</u>, 596 F.2d 842 (9th Cir. 1979), the defendant, an officer of a local union that had contracted with a local redevelopment agency to perform public park and mall maintenance, was accused of stealing government funds in violation of 18 U.S.C. § 641. <u>Id.</u> at 843-44. The local redevelopment agency received funds from the Department of Housing and Urban Development ("HUD") for the maintenance projects. <u>Id.</u> at 844. Pursuant to the contracts with the union, the funds for the projects were deposited in separate identifiable accounts that were created under conditions approved by the agency. <u>Id.</u> The contracts further provided that HUD officials would have access at all reasonable times to all records pertaining to the services performed. <u>Id.</u>

The Court in <u>Johnson</u> found that the government had retained "substantial supervision and control over the funds." <u>Id.</u> First, the Court noted that the local development agency was required to maintain detailed financial records, file annual financial and progress reports, and adopt government-approved accounting systems. <u>Id.</u> Second, the Court noted that the local development agency was required, with few exceptions, to return any interest on the grant funds advanced and to use any excess funds for purposes contemplated by the HUD statutes and regulations. <u>Id.</u> at 845. Third, the Court noted that the contracts required the union to keep records in accordance with prudent business practices to allow authorized representatives of HUD to have access at all times to the records and other materials maintained by the union pertaining to the services performed under the contract. <u>Id.</u> Finally, the Court noted that the contracts made it clear that the funds to be disbursed were from the United States and were to be disbursed in accordance with the agency's contract with the United States and the applicable legislation. <u>Id.</u> Based upon these facts, the Court

concluded that the government's interest in these funds "followed those funds into the bank account created under the contracts with the union." Id.

The defendants argue that many of the above-cited cases are distinguishable because those cases involved funds advanced under federal grants, not money earned pursuant to a government contract. The defendants argue that the critical distinction between a government contractor and a recipient of grant funds is that a federal grantee is advanced funds to expend for a particular purpose, whereas a government contractor is a commercial entity paid for services performed pursuant to a contract. Accordingly, the defendants argue, any reliance on cases involving grant funds would be misplaced.

The Court disagrees. In all of these cases, the issue is whether the government exercises supervision and control over the funds at issue. While that situation might most commonly arise when the funds are part of a government grant, such supervision and control may also exist where the recipient of the government funds is performing services pursuant to a government contract. For example, in United States v. Littriello, 866 F.2d 713 (4th Cir. 1989), the defendants were convicted of embezzling government funds from a federal employee health benefit plan, which was operated by a union under a contract with the Office of Personnel Management. Id. at 713. At issue were funds received from the federal government that were not needed for the immediate payment of claims and thus was invested in what was termed a "Special Reserve Fund." Id. at 714. The Court rejected the defendants' argument that the funds at issue were not government funds, finding that the government had introduced substantial evidence of control and supervision of the Special Reserve Fund. Id. at 715. Specifically, the government had introduced evidence that federal regulations controlled the manner in which the fund was established; that the parties' contract

21

referenced those federal regulations; that the union was required to keep detailed records and furnish an annual accounting and other financial reports as required; that the union had to submit to audits by OPM; and that, pursuant to applicable regulations, the government retained a reversionary interest in the funds, which required their return upon termination of the union's contract. Id. Based upon its review of the applicable regulations, the contract provisions, and the government's reversionary interest in the funds, the Court found "sufficient indicia of supervision and control" to classify the funds as property of the United States within the meaning of § 641. Id. at 717.

Upon careful consideration of the record and applicable case law, the Court finds that there is sufficient indicia of supervision and control by the government over the funds at issue in this case to satisfy the requirement that the funds at issue be "money . . . of the United States." Pursuant to its contract with the government, UTB is required to keep certain records and to adopt government accepted methods of accounting. UTB's records are subject to inspection by the government. Additionally, UTB is required to maintain certain accounts, and those accounts are subject to audit by the government. UTB is required to implement various requirements of the FAR and the DEAR, such as utilizing cost and pricing data and cost analysis principles. Many of these requirements "flow down" to AIMSI as a subcontractor. AIMSI is required to adopt an acceptable method of accounting, which AIMSI did by implementing the Deltek accounting system. AIMSI's records are subject to inspection by UTB or the government. Its accounts are subject to audit by UTB and/or the government. AIMSI's subcontract acknowledges that AIMSI is being paid with government funds. Finally, AIMSI is required to comply with certain FAR provisions, such as the requirement of submitting a final indirect cost submission (which may result in any overages being repaid to the government) and utilizing cost and pricing data and cost analysis principles.

The defendants argue that once the funds were deposited into AIMSI's account, AIMSI had complete control over the manner in which the funds were spent, and thus the funds were no longer subject to control or supervision of the United States. However, government funds retain their federal character even after being deposited into a bank account of the recipient and commingled with non-federal funds as long as the government maintains some degree of supervision and control over the funds and their use. Howard, 787 F. Supp. at 770. The Court finds that the government continued to exercise supervision and control over the funds pursuant to the FAR and DEAR requirements incorporated into both UTB's contract with the government and AIMSI's subcontract with UTB. The Court further finds that the government continued to exercise supervision and control over the use of the funds because AIMSI was required to use those funds only for expenses that were allocable and allowable. Unlike the Social Security recipient who was free to spend the money received by the government however she wished, see id. at 771, AIMSI was not permitted to utilize government funds for unallocable or unallowable expenses. The indictment alleges that AIMSI did just that: it is alleged that defendant Hall had defendant Reeder and others submit fraudulent invoices which were then claimed as overhead and G&A expenses; that the fraudulent invoices were paid with government funds; and that the government funds were then deposited into bank accounts of various entities controlled by the defendants. For these reasons, the Court finds that the indictment sufficiently alleges that the money at issue was "money . . . of the United States" within the meaning of 18 U.S.C. § 641.

23

**C.     Actual Loss**

Next, the defendants argue that the indictment should be dismissed because there is no evidence that the transactions alleged in the indictment resulted in any loss to the government on the dates alleged in the indictment or at any time reasonably close to those dates. The government responds that the "booking" of a false invoice to AIMSI's overhead account as an indirect cost caused the theft/larceny of government funds and that the larceny was completed when the checks were negotiated by deposit into SWS and Biosterile accounts.

Rule 12 of the Federal Rules of Criminal Procedure provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. Crim. P. 12(b)(2). "[A] motion to dismiss is 'capable of determination' before trial if it involves questions of law instead of questions of fact on the merits of criminal liability." United States v. Craft, 105 F.3d 1123, 1126 (6th Cir. 1997). Thus, a defendant may use a Rule 12(b) motion to properly raise such matters as "former jeopardy, former conviction, former acquittal, statute of limitations, immunity [and] lack of jurisdiction." Id. (quoting United States v. Smith, 866 F.2d 1092, 1096 n.3 (9th Cir. 1989)). A district court "may ordinarily make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate factfinder." Craft, 105 F.3d at 1126.

A facially valid indictment may not be dismissed on the ground that it is based on inadequate or insufficient evidence. United States v. Driscoll, 2006 WL 335520, at *1 (E.D. Tenn., Feb. 13, 2006) (citing United States v. Williams, 504 U.S. 36, 54 (1992)). "Where a defendant's pretrial motion to dismiss requires the court to find facts that make up the elements of the case, a

24

determination which would normally be reserved to the jury at trial, the motion to dismiss should be denied." Driscoll, 2006 WL 335520, at *1.

The Court finds that the defendants' motion essentially requires a pretrial test of the government's evidence regarding the loss to the government as a result of the defendants' conduct. This is not a permissible basis for a Rule 12 motion to dismiss. See id.; Universal Milk Bottle Serv. v. United States, 188 F.2d 959, 962 (6th Cir. 1951). Accordingly, the defendants' motion with respect to this issue should be denied.

### III.  Motion to Dismiss Counts 1 and 27-39 of the Indictment

Finally, the defendants move the Court for an Order dismissing count one and counts 27-39 of the indictment charging money laundering and a conspiracy to commit money laundering. For grounds, the defendants argue (1) that the indictment fails to properly state claims of mail fraud, wire fraud, and theft of government property, and therefore, the money laundering counts that are derivative of these counts must also be dismissed and (2) that the indictment fails to sufficiently alleged specific criminal activity that is distinct from the conduct that also forms the basis of the money laundering counts. [Doc. 30].

Because the Court has found that the indictment sufficiently alleges the offenses of conspiracy, wire fraud, mail fraud, and theft of government property, the Court finds the defendants' first argument to be without merit.

With respect to the defendants' second argument, the Court finds that the indictment sufficiently alleges the offense of money laundering. The elements of the offense of money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), are as follows: "(1) use of funds that are proceeds of

unlawful activity; (2) knowledge that the funds are proceeds of unlawful activity; and (3) conduct or attempt to conduct a financial transaction, knowing that the transaction is designed in whole or in part to disguise the nature, location, source, ownership, or control of the proceeds." United States v. Moss, 9 F.3d 543, 551 (6th Cir. 1993); see also United States v. Elder, 90 F.3d 1110, 1124 (6th Cir. 1996). With respect to the first element, the Sixth Circuit has held that "the funds [allegedly laundered] must represent proceeds from some form of activity that constitutes a felony." United States v. Prince, 214 F.3d 740, 747 (6th Cir. 2000) (citing 18 U.S.C. § 1956(c)(1)). The term "proceeds" is defined as "what is produced by or derived from something (as a sale, investment, levy, business) by way of total revenue." Id. at 747 (quoting United States v. Haun, 90 F.3d 1096, 1101 (6th Cir. 1996)).

The indictment in the present case tracks the language of the money laundering statute and lists all of the elements of the offense of money laundering. The indictment alleges that defendant Hall, aided and abetted by defendant AIMSI and others

> did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce involving a monetary instrument, that is, the deposit of a check . . . into an account of the payee at the listed bank in the Eastern District of Tennessee, which involved the proceeds of specified unlawful activity, that is, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and theft of government property in violation of 18 U.S.C. § 641, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction, knew that the property involved in the financial transaction, the checks, represented the proceeds of some form of unlawful activity.

[Doc. 1 at 17-21]. The indictment goes on to describe the numerous transactions, including the date and amount of transactions, as well as the payor, payee, and bank of deposit of the check, which

26

constitute the acts of alleged money laundering. [Id.]. The indictment further identifies the specified unlawful activities, namely theft, mail fraud, and wire fraud, from which the subject proceeds were allegedly derived. [Id.]. The Court finds that counts 27-39 of the indictment set forth all of the elements of the offense of money laundering, give notice to the defendants of the charges, and are sufficient to protect the defendants from double jeopardy.

The Court further finds that count one of the indictment sets forth all of the elements of the offense of conspiracy to commit money laundering. "The essential elements of the crime of conspiracy are that the alleged conspiracy existed, the defendant willfully became a member, and one of the conspirators knowingly committed at least one alleged overt act in furtherance of some object or purpose of the conspiracy." United States v. Ross, 190 F.3d 446, 450 (6th Cir. 1999). In the present case, count one of the indictment alleges that the defendants Hall, AIMSI, and Reeder "willfully and knowingly did combine, conspire, confederate and agree with each other and divers other persons to the grand jury known and unknown" to commit, among other things, the offense of money laundering. [Doc. 1 at 4-5]. The indictment goes on to allege several overt acts allegedly committed by the defendants related to the charges of money laundering. [Doc. 1 at 8-13, 17-21]. Accordingly, the Court finds that count one of the indictment sets forth all of the elements of the offense of money laundering, gives notice to the defendants of the charges against them, and is sufficient to protect the defendants from double jeopardy. Accordingly, it is **RECOMMENDED** that the defendants' Motion to Dismiss the Money Laundering Charges in Indictment, Counts 1 and 27-39 [Doc. 30] be **DENIED**.

# IV.  Conclusion

For the foregoing reasons, it is **RECOMMENDED** that the defendants' Motion to Dismiss Counts 1-15 of the Indictment for Failure to State an Offense – No "Scheme to Defraud" the Government is Alleged [Doc. 26] be **DENIED**; the defendants' Motion to Dismiss Counts 1 and 16-26 of the Indictment Because the Money at Issue Was Not Money or Property of the United States [Doc. 28] be **DENIED**; and the defendants' Motion to Dismiss the Money Laundering Charges in Indictment, Counts 1 and 27-39 [Doc. 30] be **DENIED**.[2]

**Respectfully submitted,**

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).